UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| ANNESTRA TAYLOR-DOYLE, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 07-1048 |
| | ) |
| DAVID POEHLS, et. al., | ) |
| | ) |
| Defendants. | ) |

## **ORDER**

This matter is now before the Court on Defendant Steven Sizemore's ("Sizemore") Motion for Summary Judgment. For the reasons set forth below, the Motion [#91] is GRANTED.

## **JURISDICTION**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 (a)(4), as the claims arise under the Civil Rights Act of 1871, 42 U.S.C. § 1983. The Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. §1367.

## **FACTUAL BACKGROUND**

On March 2, 2006, Plaintiff Annestra Taylor-Doyle ("Taylor-Doyle") met with Richwoods High School Dean David Poehls ("Poehls") to discuss the option of alternative probation for S.T., Taylor-Doyle's adopted daughter. This meeting occurred immediately following the completion of S.T.'s five-day suspension for engaging in sexual intercourse on school property. The exact statements made by Taylor-Doyle during the meeting are in dispute and greatly muddled by Plaintiff's inconsistent deposition testimony. However, Taylor-Doyle admits that she used profanity, and both parties agree that she directed the specific phrase "your ass" toward S.T. (Taylor-Doyle Dep. 60: 5-15; Poehls Dep. 71: 22-24.) After Taylor-Doyle left the meeting,

Poehls noticed that S.T. appeared "very upset" and had "a very shaken look about her". (Poehls Dep. 78: 12-18.) Poehls asked S.T. if Taylor-Doyle abused her, and S.T. answered affirmatively, specifically stating that Taylor-Doyle hit her on the head with a shoe and dunked her head in water. After hearing S.T. repeat her statements to her counselor, Debbie Kelone ("Kelone"), and believing that marks on S.T.'s forehead and neck added credibility to S.T.'s account, Poehls alerted the campus police officer of S.T.'s allegations of abuse and called the Illinois Department of Children and Family Services ("DCFS") suspected abuse hotline.

Sizemore, a Child Protection Investigator with DCFS, partnered with Detective David Nelson ("Nelson") of the Peoria Police Department and jointly interviewed S.T. in Poehls office later that same day. During the interview, Sizemore and Nelson both noticed a mark on S.T.'s forehead and marks on her neck. S.T. repeated her allegation that Taylor-Doyle hit S.T. on the forehead with a shoe and Sizemore believed that the mark on S.T.'s forehead was consistent with the allegation. Sizemore and Nelson continued joint interviews at the police station on the evening of March 2, 2006, speaking with Taylor-Doyle, her husband Gary Doyle ("Doyle") and S.T. During her interview, Taylor-Doyle denied the allegations, and Mr. Doyle stated that S.T. injured her forehead when she bumped into a kitchen cabinet. During the this second interview with S.T., she recanted the statements she made to Poehls earlier that day and stated that she received the mark on her forehead after she hit her head on a cabinet. Before leaving the police station, Taylor-Doyle and Mr. Doyle signed a safety plan under which Taylor-Doyle agreed to stay out of her home and refrain from contact with her children pending further interviews. The safety plan was in effect from March 2, 2006 to March 6, 2006. On March 6, a new safety plan was enacted, allowing Taylor-Doyle to be in the home with the children as long as all contact

between Taylor-Doyle and the children was supervised by either her husband, her daughter Arianne Taylor, or her sister Rissa Taylor.

Over the next few days, Sizemore and Nelson continued to jointly interview witnesses, including S.T.'s siblings and her friend, M.C. During the March 3, 2006 interview with Sh.T., S.T.'s brother, Sh.T. stated that Taylor-Doyle struck S.T. in the face with a shoe and forcibly placed S.T.'s head in a basin of water. Sizemore and Nelson re-interviewed Sh.T. at the Peoria Police Department later the same day. Sh.T. repeated his earlier statements and stated that he witnessed Taylor-Doyle hit S.T. after she spoke with Poehls over the telephone, and that Taylor-Doyle hit S.T. with a shoe and choked her following the February 22, 2006 telephone call from Poehls regarding S.T.'s discipline. This statement was contradicted by S.T.'s other siblings, L.T., K.D., and Ki.A., who all stated that S.T. received the mark on her forehead from a kitchen cabinet. L.T. also stated that the mark on S.T.'s neck was the result of roughhousing with her brother Sh.T, who subsequently denied this accusation.

On March 21, 2006, Sizemore was informed that Taylor-Doyle had been arrested by the Peoria Police Department for endangering the life and welfare of a child and domestic battery. Subsequent to Taylor-Doyle's arrest, Mr. Doyle entered into a DCFS safety plan that restricted Taylor-Doyle's access to the children and required that the children reside outside of Taylor-Doyle's home. Gary Doyle renewed this plan weekly until April 24, 2006, around the time that the charges against Taylor-Doyle were dropped. However, although the criminal charges against Taylor-Doyle were dropped, her foster children were not allowed to move back into Taylor-Doyle's home because the allegations against Taylor-Doyle before DCFS were still pending.

On June 14, 2006, Sizemore met with his supervisor, Karla Allen, to discuss the DCFS investigation of Taylor-Doyle. After reviewing the interviews Sizemore conducted months

3

earlier, Allen decided to "indicate" Taylor-Doyle for child abuse. Taylor-Doyle appealed the indicated finding of child abuse with DCFS, and on January 11, 2007, the DCFS Administrative Hearings Unit entered an order voluntarily unfounding the indicated child abuse finding against Taylor-Doyle and dismissed the administrative proceeding.

On March 2, 2007, Plaintiffs, Annestra Taylor-Doyle, individually, and as mother and next friend of S.T. and L.T., commenced this action against Poehls and District 150; Nelson and the City of Peoria, IL; Sizemore; Michael McCoy, Sheriff of Peoria County; Stephen Smith, Jail Superintendant of Sheriff of Peoria County; Peoria County, Illinois; and Jennifer Streitmatter, Director of Human Services for the Children's Home. Defendants McCoy, Smith, Streitmatter, and Peoria Countyhave all been subsequently dismissed from this matter with prejudice. Also dismissed with prejudice was Plaintiff S.T. Remaining are Plaintiff's various constitutional and state law claims against Defendants Poehls and District 150, Nelson and the City of Peoria, and Sizemore. On July 10, 2009, Defendant Sizemore filed the instant Motion for Summary Judgment. This matter is now fully briefed, and this Order follows.

## STANDARD OF REVIEW

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party must demonstrate, through portions of the record or affidavits, the absence of a triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. Celotex, 477 U.S. at 324. Nevertheless, this Court must "view the record and all references drawn from it in the light most favorable to the [non-moving party]." Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989). The Court will deny summary judgment if a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

**DISCUSSION**

In order to state a claim for relief under § 1983, the plaintiff must allege the deprivation of a right secured by the Constitution or laws of the United States by a person acting under color of state law. Kramer v. Village of North Fond du Lac, 384 F.3d 856, 861 (7th Cir. 2004) (citing Gomez v. Toledo, 446 U.S. 635, 640 (1980)). The first inquiry in any § 1983 suit is whether the plaintiff was deprived of a right secured by the Constitution or laws of the United States. Baker v. McCollam, 443, US 137, 140 (1979). Taylor-Doyle asserts that Defendant Sizemore violated her Fourth Amendment rights against unreasonable searches and seizures as well as her rights to familial relations under the Fourteenth Amendment.

I. **Fourth Amendment**

Taylor-Doyle brings a Fourth Amendment claim on behalf of her daughter, L.T., who was removed from Taylor-Doyle's home pursuant to the March 21, 2006 DCFS Child Safety Plan. The Fourth Amendment protects "the right of the people to be secure in their persons, houses,

papers, and effects, against unreasonable searches and seizures". U.S. Const. Amend. IV. A Fourth Amendment "seizure" occurs if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave". Brokaw v. Mercer County, 235 F.3d 1000, 1010 (7th Cir. 2000). Although, the record does not address which party (the police, DCFS, or Plaintiff) physically removed L.T. from Taylor-Doyle's home, the Court will proceed on this issue as though a constitutional seizure occurred. The record clearly shows, however, that there is no genuine issue of material fact concerning whether the removal of L.T. from Taylor-Doyle's home was reasonable.

When a child is removed from his or her home, the seizure is reasonable under the Fourth Amendment if "it is pursuant to a court order, if it is supported by probable cause, or if it is justified by exigent circumstances," such as situations in which "state officers have reason to believe that life or limb is in immediate jeopardy". *Id*. L.T. was removed from Plaintiff's home pursuant to two documents: a DCFS Child Safety Plan and an Arraignment Order (abuse/neglect). The removal of L.T. pursuant to the Order of Protection contained within the Arraignment Order is undisputedly a seizure pursuant to a court order. Thus, the only matter at issue is L.T.'s removal pursuant to the child safety agreements.

A DCFS Child Safety Plan is an "interim settlement agreement pending the outcome of an investigation". Dupuy v. Samuels, 465 F.3d 757, 761 (7th Cir. 2006). Plaintiff asserts that she felt as if she had no choice and "had" to agree to the child safety plan. However, the "decision to agree to a safety plan is optional" for the parents, and as with any settlement, the fact they may face repercussions if they reject the offer does not negate the voluntariness of the agreement. *Id.* The plaintiffs in Dupuy raised the same challenge to DCFS safety plans, and the Seventh Circuit resoundingly rejected the argument:

> It adds nothing to say as the plaintiffs do that they did not *really* consent-that the state "coerces" agreement to safety plans by threatening to remove the child from his parents' custody unless they agree to the plan…. The consent form that the state gives parents requires them if they consent to state in writing that they "understand that failure to agree to the [safety] plan or to carry out the plan may result in a reassessment of my home and possible protective custody and/or referral to the State's Attorney's Office for a court order to remove my children from my home." This just notifies the parents of the lawful measures that may ensue from their failure to agree to a plan or, if they agreed to it, from their violating the plan. If the agency has even a bare suspicion, this may ripen in the course of the investigation into cause to obtain a court order of removal, and this possibility is all that the consent form should and does warn the parents of. *Id* at 761.

Plaintiff does not dispute that Gary Doyle entered into a safety plan on March 21, 2006 which required the children to reside outside of Taylor-Doyle's home. He renewed this plan weekly until April 24, 2006. One of L.T.'s parents voluntarily agreed to remove her from the home pending the completion of the investigation. The fact that she was subsequently removed in compliance with this agreement is thus completely reasonable.

## II. Fourteenth Amendment Claims

Taylor-Doyle also alleges that Sizemore interfered with her substantive due process rights to familial relations under the Fourteenth Amendment. "The interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized." Troxel v. Granville, 530 U.S. 57, 65 (2000). Meyer v. Nebraska, 262 U.S. 390, 399 (1923); *see also*; Doe v. Heck, 327 F.3d 492 (7th Cir. 2003). However, the right to familial relations is not absolute. Doe, 327 F.3d at 520. In order to determine whether an individual's right to familial relations has been violated by a government actor, courts must perform a balancing test "between the fundamental right to the family unit and the state's interest in protecting children from abuse". Brokaw v. Mercer County, 235 F.3d 1000, 1019 (7th Cir. 2000). The standard is whether the state has "some definite and articulable evidence giving rise

to a reasonable suspicion that a child has been abused or is in imminent danger of abuse". *Id* at 1019.

Taylor-Doyle was separated from her children pursuant to multiple Illinois DCFS child safety plans. Plaintiffs primarily argue that the child safety plans are unconstitutional because there was no reasonable basis upon which Sizemore could have suspected that L.T. was abused or in imminent danger of abuse. The Court disagrees. On the morning of March 2, S.T. told Dean Poehls that Taylor-Doyle hit her in the head with a shoe and forcibly dunked her head in dishwater. She repeated these statements to her counselor, Debbie Kelone, and to Sizemore and Detective Nelson in a manner consistent with her initial statements to Poehls. Additionally, Sizemore observed a cut of S.T.'s forehead and bruises on her neck which were consistent with the account given by S.T. Although S.T. later recanted her statement after her parents brought her to the police station that night, Sizemore observed that S.T. "appeared to be very stressed… [s]he appeared to be under some form of pressure." (Sizemore Dep. 188: 15-19). S.T.'s demeanor appeared to be a "marked change" from her demeanor earlier in the day in Poehls' office. *Id.* Thus, based on Sizemore's own personal knowledge and observations, he did not believe S.T.'s statements in the police office to be credible.

Plaintiff asserts that a genuine issue of fact is established by (1) S.T.'s recantation and (2) the statements given by Taylor-Doyle's younger children to Sizemore explaining that S.T. injured herself by hitting her head on a cabinet and that Sh.T. caused the bruises on S.T.'s neck. However, even when viewing S.T.'s recantation and the statements of the younger children in Taylor-Doyle's home, in the light most favorable to Plaintiff, the totality of the circumstances reveal that Sizemore's decision to offer the child safety plan was still based on a reasonable suspicion. In addition to Sizemore's personal observations of S.T. during her interviews, Taylor-

8

Doyle's son, Sh.T. told Sizemore that he personally observed incidents of abuse in the home and that Taylor-Doyle threatened her children so that they would lie and cover up the incidents. Whether these statements are true, as proof that Taylor-Doyle actually abused her children or that she actually told her child to lie about the incidents is immaterial to this matter. Instead, Sh.T.'s statements during his interview with Sizemore shed light on the circumstances underlying Sizemore's evaluation of the statements given to him by children who remained in contact with Taylor-Doyle. Sh.T.'s statements provide a reasonable basis for Sizemore to view the cabinet door story skeptically, offer the child safety plans to the Doyles, and proceed with his investigation.

As discussed above, the 7th Circuit examined the child safety agreements in depth in Dupuy and concluded that a child safety plan is an "interim settlement agreement". In explaining why the Constitution does not entitle parents to a hearing prior to being offered the option of agreeing to the safety plan, the Court explains:

> "There is no right to a hearing when no substantive right has been infringed or is threatened with being infringed. The state does not force a safety plan on the parents; it merely offers it. Parents are entitled to a hearing if their parental rights are impaired, but the offer of a settlement no more impairs those rights than a prosecutor's offer to accept a guilty plea impairs the defendant's right to trial by jury" Dupuy, 465 F.3d at 761.

The offer of the child safety plans, essentially a settlement offer, does not impair or infringe Plaintiff's substantive rights. The record shows that Sizemore had definite and articulable evidence underlying a reasonable suspicion of Taylor-Doyle. Because the record contains no evidence of fraud or coercion on the part of Sizemore, the separation of Plaintiff and her children pursuant to the optional child safety plan (that the parents voluntarily signed) is not a violation of the right to parental liberty under the Fourteenth Amendment.

**III. Qualified Immunity**

Sizemore has raised the defense of qualified immunity. Under this doctrine, public officials are shielded from individual liability in § 1983 lawsuits arising out of actions taken while performing discretionary functions. Brokaw, 235 F.3d at 1022 (citing Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Public officials will not be granted qualified immunity when "their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." Id.; see also Darryl H. v. Coler, 801 F.2d 893, 907 (7th Cir.1986). The first inquiry before the court is whether a constitutional violation has occurred. Then the court must consider whether, at the time of the violation, the public official's conduct violated a constitutional right that "was so obvious that a reasonable person would have known of the unconstitutionality of the conduct at issue." Brokaw, 235 F.3d at 1022.

Even assuming, *arguendo*, that a reasonable fact finder could determine such action violated Plaintiff's rights, Sizemore is entitled to qualified immunity for his actions. The unconstitutionality of Sizemore's actions is not clearly established by law. All of Sizemore's actions were within the context of his employment, and he utilized an established DCFS practice when he offered Taylor-Doyle, a parent under investigation, the option of entering into a child safety agreement. In light of the marks on S.T.'s body, her repeated and consistent initial statements accusing Taylor-Doyle of abuse, the suspicious nature of her recantation, and the information shared by Sh.T., a reasonable person would not have known that implementing a child safety plan (to which the Plaintiff agreed) pending the conclusion of further investigation was clearly in violation of Plaintiff's constitutional rights. Additionally, Plaintiff has not shown that Sizemore fabricated any evidence or engaged in any conduct outside the scope of his

employment which was obviously unconstitutional. Accordingly, Sizemore is entitled to qualified immunity on this claim.

IV. **State Law Claims**

Under Illinois law, a plaintiff seeking relief on a claim of malicious prosecution must establish five elements: (1) the commencement or continuation of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for the proceeding; (4) malice; and (5) damages. All of these elements must be present; the absence of even one element will preclude recovery for malicious prosecution. Logan v. Caterpillar, Inc., 246 F.3d 912, 922 (7th Cir. 2001).

As discussed above, Sizemore had an unquestionably reasonable basis upon which to proceed with his investigation of S.T.'s abuse allegations against Taylor-Doyle. Additionally, Plaintiff does not point to one shred of evidence in the record which indicates that malice played a part in Sizemore's actions. Finally, the Court questions whether the DCFS proceedings were terminated in Taylor-Doyle's favor, because the "Illinois Appellate Court has made it clear that an 'unfounded' determination 'is not a final determination that the accusations… were false,' and, in itself, does not establish a 'reasonable probability of falsity'". Cookson v. Schwartz, 556 F.3d 647, 655 (7th Cir. 2009). However, because the record contains no evidence whatsoever that malice played a role in Sizemore's actions, the Court will not wade into a complex evaluation of the other four elements of malicious prosecution. Summary judgment is thus issued in favor of the Defendant on this claim.

V. **Public Official Immunity**

Because the Court has decided the state law claims on the merits, the issue of public official immunity need not be addressed.

## CONCLUSION

For the foregoing reasons, Sizemore's Motion for Summary Judgment [#91] is GRANTED.

ENTERED this 2nd day of February, 2010.

                                                  s/ Michael M. Mihm
                                                  Michael M. Mihm
                                                  United States District Judge